```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 24, 2009
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
  :
NATHANIEL T. BROWN, as TRUSTEE OF  :
DECA TRUST,  :
  :
          Plaintiff,  :
  :      06 Civ. 7871 (PAC)
   -against-  :
  :      OPINION & ORDER
MITCHELL-INNES & NASH, INC., DAVID  :
NASH, Individually, ADOLF WÜRTH  :
GmbH & CO. KG, and WÜRTH  :
INTERNATIONAL AG,  :
  :
          Defendants.  :
  :
------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

This case involves a dispute over ownership of the painting "Mystery of the Beach," created by the Norwegian expressionist Edvard Munch in 1892. Deca Trust, the Plaintiff, owned the painting from May 2004 until it was sold in May 2006 to Defendants Adolf Würth GmbH & Co. KG ("Würth KG") and Würth International AG (together with Würth KG, the "Würth Entities" or "Defendants") through Mitchell-Innes & Nash, Inc. ("MIN"), an art dealer in New York City. Plaintiff seeks the return of the painting from the Würth Entities and also brings claims for illegal conversion and for a declaratory judgment naming Deca Trust as the rightful owner.[1] The Würth Entities move to dismiss the claims for lack of personal jurisdiction and for failure to state a claim under Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court denies the Defendants' 12(b)(2) motion to

---

[1] Plaintiff also brought causes of action against MIN and MIN's director David Nash, but Plaintiff settled with those parties and no longer pursues those claims.

1

dismiss for want of jurisdiction; but grants the 12(b)(6) motion for failure to state a claim upon which relief can be granted.

## BACKGROUND

**I.      Factual Allegations**[2]

In June 2001, a group called ArtColl Trust purchased "Mystery of the Beach" ("the painting") from a European seller. On May 26, 2004, ArtColl Trust assigned the painting to Deca Trust, and on the same day Deca Trust and MIN entered into a consignment agreement. (See First Amended Complaint ("Am. Compl.") ¶¶ 11, 13.) Deca Trust, through its trustee Nathaniel T. Brown, is based in Washington State. MIN is based in New York City. MIN's obligations under the agreement were to take possession of the painting for the purpose of making and receiving offers on its sale. (Id. ¶ 13.)

The consignment agreement stated that MIN had to obtain Deca Trust's written consent before removing the painting from MIN's New York premises. (Id. ¶ 16; Ex. B ¶ 3.3.) The agreement also stated that MIN did not have authority to sell the painting without Deca Trust's approval. (Id. ¶ 18; Ex. B ¶ 9.1.) The agreement limited MIN to selling the painting for a gross price of not less than $7 million. MIN was permitted to sell the painting for less, provided that Deca Trust received at least $6 million in net sales proceeds after MIN took its commission. (Id. ¶ 19; Ex. B ¶ 1.1.) Deca Trust and MIN added an amendment to their consignment agreement on December 20, 2006, to allow the painting to be loaned to the Museum of Modern Art ("MoMA")

---

[2]      All facts in this section are taken from Plaintiff's First Amended Complaint, unless otherwise noted.

for a Munch exhibition from January 30, 2006 through May 26, 2006. (Id. ¶ 16; Ex. B at "Amendment 2 to Consignment Agreement.")³

The Würth Entities are based in Germany and Switzerland. The Amended Complaint states that Würth KG owns a museum called Museum Würth, and that the Würth Entities acquire more than 1,000 paintings a year and earn income from the public display of their painting collections. (Id. ¶¶ 4, 5, 27.) According to the Amended Complaint, in early 2006 an art consultant and dealer named Christoph Graf Douglas contacted Sylvia Weber, the curator for Museum Würth, to tell her that "Mystery of the Beach" was for sale. (Id. ¶ 28.) Douglas had allegedly consulted with the Würth Entities for many years about their art collection and possible acquisitions, and Plaintiff attempts to classify Douglas as an agent of the Würth Entities (see id. ¶ 22), though Defendants dispute this characterization. Crucial to Plaintiff's claims here, Douglas is allegedly also a co-owner of a separate art-consulting business in New York with Nash, MIN's director. (Id. ¶ 21.) The Amended Complaint also alleges that the Würth Entities and MIN had worked together on art sales and purchases on previous occasions. (Id. ¶¶ 23-26.)

In response to Douglas' call about "Mystery of the Beach," Weber allegedly told Douglas to contact MIN and have MIN contact her. (Id. ¶ 29.) A MIN employee named Lucy Dew then contacted Weber in February 2006 and sent a photo—an Ektachrome—of the painting to Weber. (Id. ¶¶ 30, 32.) The Amended Complaint states that the Defendants "instructed one of their agents to view the Painting in New York" in connection with their interest in purchasing the painting. (Id. ¶ 31.)

On April 7, 2006, a Würth Museum representative e-mailed Dew and asked whether the painting was still available. (Id. ¶ 34; Ex. L.) At some point between April 7 and May 18, Weber

---

³ It is unclear from the pleadings or attached records why the amendment is dated December 20, 2006, which would put the executed amendment at a time after the exhibition. The Court assumes that the amendment contained a misprint, and that the intended date is December 20, 2005.

3

allegedly phoned MIN and asked MIN to ship the painting to Germany. The painting returned to MIN from the MoMA exhibit on May 12, 2006, and MIN shipped it to Germany on May 18. (Id. ¶¶ 36-38.) Before the painting was shipped, MIN and the Defendants allegedly agreed on a purchase price of $6.5 million. Despite the clear language of the consignment agreement, MIN never notified Deca Trust of its dealings with the Würth Entities or that it had shipped the painting to Germany. (Id. ¶ 38.)

Sometime between May 24 and May 31, Weber telephoned MIN and said that the Würth Entities would purchase the painting. Over the next several weeks Defendants and MIN discussed how the painting would be invoiced, and on June 14, 2006, Würth International wired $6.5 million to MIN's account at First Republic Bank in New York City. (Id. ¶¶ 40-46.)

Once the sale was complete, MIN finally advised Deca Trust of the Defendants' interest in and subsequent purchase of the painting. MIN director Nash allegedly contacted Tara Coram, Senior Curator for Deca Trust, on June 21, 2006, and said that he had a prospective buyer for the painting for $6.5 million. Nash asked that he be able to retain a commission that would leave Deca Trust with only $5.85 in net proceeds. On July 6, 2006, after Deca Trust rejected Nash's proposal, Nash told Coram that he had already sold the painting for $6.5 million, and Nash informed Coram that he was no longer in possession of the painting. (Id. ¶¶ 48-54.) At Deca Trust's request, Nash sent a letter to Defendants requesting return of the painting and cancellation of the sale, but Defendants refused. (Id. ¶¶ 55-57; Ex. G, F.)

## II. Procedural History

Plaintiff first filed a complaint on September 9, 2006, naming only MIN and Nash. Plaintiff took limited depositions in the case, including depositions of some of the parties in Germany. On December 9, 2007, the Court granted Plaintiff's motion to amend the complaint

4

and add the Defendants to the case. Plaintiff, MIN, and Nash stipulated to MIN and Nash's dismissal from the case on May 6, 2008. In September 2008 Defendants filed a motion to dismiss the Amended Complaint, and the Court held oral arguments on the motion on April 17, 2009.

## DISCUSSION

### I.     Personal Jurisdiction

At oral argument on April 17, 2009, the Court denied Defendants' 12(b)(2) motion to dismiss for want of personal jurisdiction over the Defendants. The Court finds that it has personal jurisdiction over the Würth Entities based on N.Y. C.P.L.R. § 302(a).[4]

Section 302(a)(1) requires that a court determine "(1) whether the defendant transacts any business in New York and, if so, (2) whether this cause of action aris[es] from such a business transaction." Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007) (internal quotations omitted). As already stated on the record, the Defendants have purposely availed themselves of the privilege of conducting business in New York by calling and e-mailing MIN several times over a period of several weeks to negotiate the purchase of a painting located in New York. The painting was shipped from New York. Payment was made here in New York. Plaintiff also alleges that Defendants sent a person to view the painting in New York. Further, this purchase was one of several between the parties allegedly originating in New York over a period of four years. There are sufficient contacts with New York for the Court to exercise jurisdiction over the Defendants, and the cause of action undoubtedly arises from the transaction centered in New York. See Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs., 850 N.E.2d 1140,

---

[4]     Section 302(a)(1) states that a court may exercise personal jurisdiction over a non-domiciliary when that party, either in person or through an agent, "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1).

1141-43 (N.Y. 2006) (finding personal jurisdiction where a sophisticated out-of-state institutional trader placed a call to a New York broker to make a trade that was later challenged); Parke-Bernet Galleries, Inc. v. Franklyn, 256 N.E.2d 506, 508-09 (N.Y. 1970) (finding personal jurisdiction where the out-of-state defendant was on the telephone with an auction-house agent in New York working on his behalf to place bids during an auction).

Further, exercising jurisdiction does not "offend traditional notions of fair play and substantial justice" under the Due Process Clause of the Fourteenth Amendment. Porina v. Marward Shipping Co., 521 F.3d 122, 127 (2d Cir. 2008) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  The Court has personal jurisdiction over the Defendants.

## II. Standard on Motion to Dismiss Under Rule 12(b)(6)

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "is to accept as true all facts alleged in the complaint." Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).  But mere "formulaic recitation of the elements of a cause of action" will not suffice; instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  To survive a motion to dismiss, courts require "enough facts to state a claim to relief that is plausible on its face." Id. at 570; see also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (a plaintiff must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible.") (emphasis added).  Further, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Gebhardt v. Allspect, Inc., 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000) (citation omitted).

### III. Protection for Buyers in the Ordinary Course of Business Under the N.Y. U.C.C.

Defendants argue that their purchase is protected by the New York Uniform Commercial Code ("UCC") because they were innocent buyers unaware of MIN's breach of the consignment agreement, and that MIN, as an art merchant dealing in artwork, had the power to transfer the title of the painting from Deca Trust to the Würth Entities.  Defendants argue that the Amended Complaint fails to allege facts that show that the Würth Entities' purchase is not entitled to the protection of the UCC.

New York UCC § 2-403 states:

> (1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though
>
>> (a) the transferor was deceived as to the identity of the purchaser, or
>> (b) the delivery was in exchange for a check which is later dishonored, or
>> (c) it was agreed that the transaction was to be a "cash sale", or
>> (d) the delivery was procured through fraud punishable as larcenous under the criminal law.
>
> (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.
>
> (3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods has been such as to be larcenous under the criminal law.

The relevant section in this dispute is § 2-403(2), the "entrustment" provision.  The New York Court of Appeals discussed this provision in the seminal art-purchase case Porter v. Wertz, 421 N.E.2d 500, 500-01 (N.Y. 1981).  The court stated that:

7

> [t]he 'entruster provision' of the Uniform Commercial Code is designed to enhance the reliability of commercial sales by merchants (who deal with the kind of goods sold on a regular basis) while shifting the risk of loss through fraudulent transfer to the owner of the goods, who can select the merchant to whom he entrusts his property. It protects only those who purchase from the merchant to whom the property was entrusted in the ordinary course of the merchant's business.

Id.; see also Graffman v. Espel, No. 96 Civ. 8247 (SWK), 1998 WL 55371, at *3 (S.D.N.Y. Feb. 11, 1998) ("Under this provision, a buyer in the ordinary course of business will prevail over the claim of an owner who entrusted such items to the merchant."). The theory behind the UCC's entrustment provision is that a person who knowingly delivers his property to a merchant dealing in goods of that kind "assumes the risk of the merchant's acting unscrupulously by selling the property to an innocent purchaser." Graffman, 1998 WL 55371 at *3. The UCC enhances confidence in commercial transactions by protecting the innocent purchaser who buys from a merchant dealing in goods of that kind, even if the merchant acts unscrupulously. See N.Y. U.C.C. § 2-403(1) ("A person with voidable title has power to transfer a good title to a good faith purchaser for value."); Interested Lloyd's Underwriters v. Ross, No. 04 Civ. 4381 (RWS), 2005 WL 2840330, at *5 (S.D.N.Y. Oct. 28, 2005) ("Unlike a thief, an entrustee has voidable, as opposed to void, title, and therefore can pass good title to a third party.").

New York UCC § 2-403(2) only protects "a buyer in the ordinary course of business," which is defined as:

> a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices.

N.Y. U.C.C. § 1-201(9).

Merchants, as opposed to other purchasers, are held to a higher standard of "good faith" under the "buyer in the ordinary course of business" analysis. See Graffman, 1998 WL 55371 at *5; N.Y. U.C.C. § 2-103(1)(b) ("'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."). A merchant, therefore, might be required under the UCC to take additional steps to verify the true owner of a piece of artwork.

In this case, the Defendants argue that they are protected by § 2-403 and that they are buyers in the ordinary course of business. First, Deca Trust clearly entrusted the painting to MIN through the consignment agreement. MIN is undoubtedly a merchant who deals in paintings. Defendants argue that they are buyers in the ordinary course of business because they bought the painting under the good-faith belief, and with no indication otherwise, that MIN had authority to sell the painting—a belief that had been correct in several previous transactions.

Plaintiff argues that the Würth Entities are not buyers in the ordinary course of business because: (1) MIN was actually an agent of the Würth Entities and the Würth Entities were essentially directing MIN's breach of the consignment agreement; and (2) the Würth Entities are merchants and therefore have a higher duty to inquire into the legality of a sale.

### a. Claim that MIN was a "Dual Agent"

Plaintiff argues that Defendants are not buyers in the ordinary course of business because MIN and Nash, MIN's principal, acted as "dual agents" for both Deca Trust and the Würth Entities. Plaintiff's theory is that if MIN acted as a dual agent, then the contract for the painting is voidable because "when an agent without the knowledge and consent of his principal represents an adverse party in a transaction, his contracts relating thereto are voidable at the

9

option of the principal." Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc., 241 F. Supp. 2d 246, 267 (S.D.N.Y. 2002) (quotation and citation omitted).

There are two ways to prove dual agency. First, "one must act as an agent, as that term is understood under the law, for two principals." Id. Second, a person can be dual agent if he "contracts to serve the other party to the transaction in a manner inconsistent with his duties to the principal." Id. (citation omitted).

Plaintiff fails to properly allege dual agency in the Amended Complaint. Plaintiff alleges that Weber, who works for the Würth Entities, has described Würth's longstanding relationship with Douglas as one of "agency." (Am Compl. ¶ 22.) Plaintiff also alleges that Douglas and Nash were joint owners of a separate art dealership. (Id. ¶ 64.) Plaintiff alleges that Weber spoke to Douglas about the painting and that Douglas then told MIN to contact Weber, which it did. (Id. ¶¶ 28-30.) The Amended Complaint also alleges that during the negotiations between Defendants and MIN, Nash told a MIN employee to keep Douglas informed. (Id. ¶ 35.)

These allegations are Plaintiff's attempt to establish that Douglas and Nash were covertly working together, on behalf of Defendants, to fraudulently sell Deca Trust's painting. But Plaintiff makes an illogical leap by arguing that MIN became Defendants' agent because "Nash and MIN acted in Würth Defendants' interests by following the precise sale procedures directed by Weber, contrary to the protocol dictated by MIN's consignment agreement with Deca Trust." (See Plaintiff's Memorandum of Law ("Pl. Mem.") 17.) This self-serving and conclusary statement makes no sense. Plaintiff essentially argues that MIN, which clearly was an agent of the seller via the consignment agreement, became the buyer's agent because it followed the buyer's delivery and invoicing instructions, which conflicted with the contractual instructions from the seller that prior approval be sought. Plaintiff tries to bend its allegations to any sliver of


fact that could show that Würth, through Douglas, knew of MIN's obligation to Deca Trust and had Nash and MIN work in opposition to that obligation. The allegations of dual agency do not make sense, and the bald conclusions in the allegations are unsupported by the rest of the pleadings. The inadequately pled allegations of dual agency cannot survive a motion to dismiss. See Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) ("[L]egal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.") (citation and quotation omitted).

### b. Claim that the Würth Entities are Merchants

Plaintiff next argues that the Würth Entities are not buyers in the ordinary course of business because they are merchants, and thus held to a higher standard of inquiry which they failed to meet. See Graffman, 1998 WL 55371 at *5. Under the UCC:

> '[m]erchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

N.Y. U.C.C. § 2-104(1).

Plaintiff alleges that Defendants are merchants because the Würth Entities "acquire more than 1,000 paintings a year for the art collections housed by one or another of the three museums owned by and/or associated with the Würth Entities." (Am. Compl. ¶ 27.) Further, "Würth Entities hold themselves out as having knowledge and skill in the acquisition of works of fine art." (Id.) Finally, the "Würth Entities derive income from various services related to the public showing of these collections." (Id.)

Defendants argue that they are not merchants because they do not sell artwork, only collect it, and that even if they are deemed merchants they only have an added duty of inquiry

where there are warning signs about problems in a sale. See Cantor v. Anderson, 639 F. Supp. 364, 367-68 (S.D.N.Y. 1986) (sophisticated art purchaser had reason to doubt seller's ownership of painting and had duty of further inquiry); Morgold, Inc. v. Keeler, 891 F. Supp. 1361, 1368-69 (N.D. Cal. 1995) (finding after trial that buyers who were also art dealers had no heightened duty of inquiry because they "responded to the available information reasonably. There were no warnings which required them to do further investigation"); Porter v. Wertz, 416 N.Y.S.2d 254, 257 (App. Div. 1st Dept. 1979), aff'd, 53 N.Y.2d 696 (1981) (merchants purchasing art cannot be "indifferen[t] as to the 'provenance', i.e., history of ownership or the right to possess or sell an object d'art"); Lindholm v. Brant, 925 A.2d 1048, 1058 (Conn. 2007) (reviewing case law and finding that "[w]e agree with these courts that a merchant buyer has a heightened duty of inquiry when a reasonable merchant would have doubts or questions regarding the seller's authority to sell").

At this stage, the Court will classify the Würth Entities as merchants under the UCC because of the allegations regarding their knowledge and experience in the art industry. See, e.g., R.F. Cunningham & Co. v. Driscoll, 790 N.Y.S.2d 368, 370 (City Court, Cayuga County 2005) (finding a farmer was a merchant under the UCC for statute of frauds purposes because farmer was "experienced in the selling of his grain products and therefore has the necessary knowledge and skill"). Assuming Defendants' merchant status under the UCC, Plaintiff's Amended Complaint still fails because it does not allege any "red flags" that would create doubt in the Defendants' mind as to the propriety of the sale.

Plaintiff's failure to plead warning signs which put the Würth Entities on notice leaves Würth within the protective ambit of § 2-403. See Interested Lloyd's Underwriters, 2005 WL 2840330, at *5 ("Whether the delay of four months between contract and delivery and the

differential between the purchase price and the market value of the Painting constitute a 'red flag' to an art dealer appears to be a factual issue not to be resolved on this motion."). Plaintiff alleges no such signals. The sale price is not obviously below market; it was within the range contracted for in the consignment agreement between Plaintiff and MIN. There is no allegation that the negotiations or procedure of the sale differed from previous—and uncontroversial— agreements between Defendants and MIN. Plaintiff admitted at oral argument that requiring Defendants to ask for a copy of the consignment agreement between Deca Trust and MIN would not be consistent with the pro-commerce spirit of the UCC. (See April 17, 2009, Oral Argument Transcript ("Tr.") 20:03-14; 24:13-20.) Short of taking that step, there was no way for Defendants to know that MIN was operating beyond the scope of its authority. The Amended Complaint even indicates that Defendants took some steps to verify the provenance of the painting; prior to the sale MIN's employee Dew performed a search on the painting through the Art Loss Register's database. (Am. Compl. ¶ 33.)[5] The natural inference is that this search was executed in furtherance of the sale of the painting to Defendants.

The failure to allege any warning signs means that Defendants are buyers in the ordinary course of business and fall within the protective scope of N.Y. U.C.C. § 2-403.

## CONCLUSION

The Court has personal jurisdiction over the Defendants. The Plaintiff, however, has failed to state a claim for which relief can be granted because the allegations in the Amended Complaint show that the Defendants' purchase is entitled to the protection of the N.Y. U.C.C. § 2-403. Defendants, even if they were merchants, had no duty of further inquiry because there are no allegations of red flags in the sale. Defendants' motion to dismiss under Rule 12(b)(6) is

---

[5] Plaintiff describes the Art Loss Register as a "database of stolen art." (Tr. 21:02-03.)

GRANTED and the Amended Complaint is dismissed without prejudice. Plaintiff may file a Second Amended Complaint that cures the pleading defect by the close of business on May 18, 2009. Failure to timely amend will result in closure of the case.

Dated: New York, New York
April 24, 2009

SO ORDERED

*(signature)*

PAUL A. CROTTY
United States District Judge